1  MICHAEL A. GARDINER. (SBN: 142321)
       mgardiner@gardinerlegal.com
2  LAW OFFICES OF MICHAEL A. GARDINER
   1230 Columbia Street, Suite 1120
3  San Diego, California 92101
   Telephone:  (619) 238-9800
4  Facsimile:  (619) 814-3727

5  Attorneys for Defendants and Cross-Complainants
   THE KOMPANY.COM, INC. dba PROGROCK RECORDS
6

7              UNITED STATE DISTRICT COURT

8            CENTRAL DISTRICT OF CALIFORNIA

9
   BRUCE BOTTS,                         Case No.  SACV09-195 MLG
10
              Plaintiff,
11
       v.                               CROSS-COMPLAINT OF THE
12                                      KOMPANY.COM
   THE KOMPANY.COM dba PROG
13 ROCK RECORDS and dba
   MINDAWN; TRI POINT MEDIA,
14 INC. dba CAM-MARKETING and
   PROG ROCK RECORDS; and DOES
15 1 to 10, inclusive,

16            Defendants.

17
   THE KOMPANY.COM, INC. dba
18 PROGROCK RECORDS,

19            Cross-Complainant,

20      v.

21 BRUCE BOTTS, an individual;
   STARCASTLE MUSIC PARTNERS,
22 an Illinois general partnership; STAN
   HERTZMAN, an individual; MARK
23 RUBEL, an individual; MATT
   STAFFORD, an individual; AL
24 LEWIS, an individual; STEVEN
   TASSLER, an individual,
25
              Cross-Defendants.
26

27      Cross-Complainant THE KOMPANY.COM, INC. dba PROGROCK

28 RECORDS ("PROGROCK RECORDS"), as and for its Cross-Complaint alleges as

CROSS-COMPLAINT                    1            Case No.  SACV09-195 MLG



follows:

# I

## PARTIES

1.    Defendant and Cross Complainant THE KOMPANY.COM, INC. dba PROGROCK RECORDS ("PROGROCK RECORDS") – incorrectly sued in this matter as "THE KOMPANY.COM dba PROG ROCK RECORDS and dba MINDAWN" -- is, and at all times mentioned herein, was a corporation duly organized and existing under the laws of the State of California.

2.    Plaintiff and Cross-Defendant BRUCE BOTTS is, and at all times mentioned herein, was a natural person and resident of the City of Cincinnati, State of Ohio.

3.    Cross-Defendant STARCASTLE MUSIC PARTNERS ("STARCASTLE") is, and at all times mentioned herein, was a general partnership organized and existing under the laws of the State of Illinois.

4.    Cross-Defendant STAN HERTZMAN ("HERTZMAN") is, and at all times mentioned herein, was a natural person and resident of the City of Cincinnati, State of Ohio.

5.    Cross-Defendant MARK RUBEL ("RUBEL") is, and at all times mentioned herein, was a natural person and resident of the City of Urbana, State of Illinois.

6.    Cross-Defendant MATT STAFFORD ("STAFFORD") is, and at all times mentioned herein, was a natural person and resident of the City of Urbana, State of Illinois.

7.    Cross-Defendant AL LEWIS ("LEWIS") is, and at all times mentioned herein, was a natural person and resident of the City of Urbana, State of Illinois.

8.    Cross-Defendant STEPHEN TASSLER ("TASSLER") is, and at all times mentioned herein, was a natural person and resident of the City of Urbana, State of Illinois.

9.     Cross-Complainant PROGROCK RECORDS is informed and believes and on that basis alleges that Cross-Defendants BOTTS, HERTZMAN, STAFFORD, LEWIS and TASSLER are or were the general partners of Cross-Defendant STARCASTLE. STARCASTLE is or was a progressive rock music band.

10.     Cross-Complainant PROGROCK RECORDS is informed and believes and on that basis alleges that SASCHA STRATER ("STRATER") is the Executrix of the Estate of Gary Strater, a former member of the "Starcastle" music group, though not a member of STARCASTLE. Gary Strater is one of the owners of the copyrights upon which BOTTS sued in this action. STRATER is not a party to this action though she would be a necessary party to a full adjudication of the intellectual property rights BOTTS seeks to "enforce."

11.     GEORGE HARP ("HARP") is, and at all times mentioned herein, was a natural person and resident of the City of Urbana, State of Illinois.   HARP is not a party to this action though he would be a necessary party to a full adjudication of the intellectual property rights BOTTS seeks to "enforce."

12.     Cross-Complainants is informed and believe, and on that basis alleges that each of the Cross-Defendants was the agent, servant, and employee of the remaining Cross-Defendants and in doing the things herein complained of was at all times acting within the scope and course of said agency, service and employment.

## II

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

13.     On or about July 2, 2005, LEWIS approached Shawn Gordon, the President of PROGROCK RECORDS about the possibility of PROGROCK RECORDS releasing "Song of Times," the latest – and likely last – recording of STARCASTLE.

14.     When LEWIS approached Gordon, he did so with the full knowledge and express permission and concurrence of all of the members of STARCASTLE. Subsequently, when RUBEL took over discussions with Gordon he too did so with

CROSS-COMPLAINT                    3                    Case No.  SACV09-195 MLG

1 | the express permission and concurrence of all of the members of STARCASTLE.

2 | 15. Between June, 2006 and early 2007, RUBEL – on behalf of

3 | STARCASTLE – and Gordon – on behalf of PROGROCK RECORDS – negotiated

4 | the terms of a License Agreement.

5 | 16. On or about February 14, 2007, RUBEL and Gordon reached agreement

6 | on the essential terms of that License Agreement.

7 | 17. The License Agreement was reduced to writing. While that written

8 | License Agreement was never fully executed by the parties, both STARCASTLE

9 | and PROGROCK RECORDS governed their conduct with respect to each other and

10 | with respect to "Song of Times" in accordance with its written terms. A true and

11 | correct copy of that License Agreement is attached hereto as Exhibit "A."

12 | 18. All of the members of STARCASTLE, specifically including BOTTS,

13 | performed in accordance with the terms of the License Agreement.

14 | 19. Thereafter a dispute arose between PROGROCK RECORDS and

15 | STARCASTLE when the later – through BOTTS and HERTZMAN – refused to

16 | inform PROGROCK RECORDS to whom the royalty payments should be made out

17 | and to which address they should be delivered.

18 | 20. In the wake of that dispute, additional disputes arose when BOTTS and

19 | HERTZMAN sought to renegotiate the terms of the License Agreement.

20 | 21. Eventually, the other STARCASTLE partners disassociated themselves

21 | from the positions taken by BOTTS and HERTZMAN and reaffirmed the terms of

22 | the License Agreement.

23 | 22. Soon thereafter, STARCASTLE and PROGROCK RECORDS reached an

24 | amicable agreement as to the dissolution of their business relationship.

25 | 23. However, angered by the fact that the partnership reaffirmed the terms of

26 | the original License Agreement and entered into an agreement for the disassociation

27 | of STARCASTLE and PROGROCK RECORDS on terms with which he did not

28 | agree, BOTTS filed this action.

CROSS-COMPLAINT                     4                Case No. SACV09-195 MLG

24. The License Agreement included provisions pursuant to which STARCASTLE warranted that it had the legal right to grant the licenses that were the subject of the License Agreement – specifically including the songs that are the subject of BOTTS' Complaint.

25. The License Agreement further included provisions under which STARCASTLE promised to indemnify and defend PROGROCK RECORDS in and against any actions – such as this one – arising out of the breach of any of its warranties or representations such as those alleged in BOTTS' action.

26. In the wake of BOTTS' filing of this action, PROGROCK RECORDS made demand on STARCASTLE that it indemnify and defend him in this action pursuant to the terms and conditions of the License Agreement.

27. While STARCASTLE has not yet refused to honor its indemnity and defense obligation to PROGROCK RECORDS neither has it committed to do so.

### III

### FIRST CLAIM FOR RELIEF

### (Contractual Indemnity – Against All Defendants)

28. Cross-Complainant refer to and realleges each and every allegation contained in paragraphs 1 through 26, inclusive, and incorporate the same herein by reference as though set forth in full.

29. If liability is imposed on PROGROCK RECORDS as a result of the matters alleged in BOTTS' Complaint, STARCASTLE has a contractual and legal duty to indemnify PROGROCK RECORDS for such liability, either in its entirety or in proportion to the relative degree of fault on the part of each party herein.

### IV

### SECOND CLAIM FOR RELIEF

### (Equitable Indemnity – Against All Defendants)

30. Cross-Complainant refer to and realleges each and every allegation contained in paragraphs 1 through 26, inclusive, and incorporate the same herein by

reference as though set forth in full.

31.    If liability is imposed on PROGROCK RECORDS as a result of the matters alleged in BOTTS' Complaint, STARCASTLE has an equitable and legal duty to indemnify PROGROCK RECORDS for such liability, either in its entirety or in proportion to the relative degree of fault on the part of each party herein.

### III

### THIRD CLAIM FOR RELIEF

**(Breach of Covenant of Good Faith and Fair Dealing – Against All Defendants)**

32.    Cross-Complainant refer to and realleges each and every allegation contained in paragraphs 1 through 25, inclusive, and incorporate the same herein by reference as though set forth in full.

33.    The License Agreement, like all contracts, like all contracts, includes an implied covenant of good faith and fair dealing that neither party will do anything that injures the right of the other to receive the benefits of the agreement.

34.    In reliance on the License Agreement, PROGROCK RECORDS incurred substantial cost in manufacturing and promoting "Song of Times" and in pursuing the distribution of the album as promised and required under the terms of the License Agreement.

35.    The conduct of BOTTS and HERTZMAN has left PROGROCK RECORDS with no choice but to withdraw "Song of Times" from active distribution thus costing PROGROCK RECORDS substantial amounts of money and denying it the benefits of the License Agreement for which it bargained.

36.    As a result of the foregoing, Defendants have materially breached the covenant of good faith and fair dealing contained in the Agreement, as set forth above.

37.    As a direct and proximate result of STARCASTLES' breaches of the covenant of good faith and fair dealing contained in the Agreement, PROGROCK RECORDS has suffered and will suffer damages in an amount in excess of the

1    jurisdictional amount of this court, according to proof at trial.

2        **W H E R E F O R E ,**  Defendant PROGROCK RECORDS prays:

3        1.    That Defendants indemnify and defend PROGROCK RECORDS;

4        2.    For general damages to be determined according to proof at the time of

5    trial;

6        3.    For costs of suit incurred herein;

7        4.    For such other and further relief as the court deems just and proper.

8    DATED:  April 20, 2009          LAW OFFICES OF MICHAEL A. GARDINER

9

10

11                                   By:_____
                                          Michael A. Gardiner

12                                   Defendants and Cross-Complainants THE
                                     KOMPANY.COM, INC. dba PROGROCK
13                                   RECORDS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROSS-COMPLAINT                      7                Case No.  SACV09-195 MLG

**EXHIBIT "A"**

LICENSE AGREEMENT

This agreement is made this ___ day of _____, 2006.

By and between

Bruce Botts
Al Lewis
Mark Rubel
Matt Stewart
DBA: Starcastle Music Partners, an Illinois Partnership

c/o:

35 Taylor St.
Champaign, IL 61820-4020

(hereinafter referred to as "Licensor")

and

The Kompany.com, Inc. d.b.a. Progrock Records
5 Coluso
Rancho Santa Margarita, CA  92688
(hereinafter referred to as "Licensee")

WITNESSETH

In consideration of the mutual promises hereinafter set forth, it is hereby agreed:

§1 OBJECT OF THE AGREEMENT

Subject to the terms and conditions herein, Licensor hereby grants to Licensee, its affiliates, subsidiaries, licensees and assigns during the Term, the sole and exclusive right and license to use each and every master recording listed hereunder throughout the Licensed Territory:

"Song of Times"

(including singles with B-Sides and Maxi single mixes) by the artist or group of recording artists professionally known as:

Starcastle

(hereinafter the "Artist")

upon the terms and conditions of this Agreement for the purpose of manufacturing, promoting, advertising, distributing, selling and otherwise exploiting Records throughout the territory of:

THE WORLD

(hereinafter referred to as the "Licensed Territory").

§2 ASSIGNMENT OF RIGHT

1. Licensor herewith transfers and assigns to Licensee without limitation and restriction whatsoever the exclusive and assignable right to exploit the Master Recordings during the Term hereof in the Licensed Territory in any manner whatsoever through any and all fields of exploitation now known or hereafter devised. The sole and exclusive rights in the Master Recordings hereby granted include, but are not limited to, the right to manufacture, distribute, sell, lease, advertise and promote digital and analog phonographic Records made thereof (including CD, DVD, LP, MC), and/or digital and analog audiovisual devices made thereof (including videotapes, CD-ROM, DVD, DVD-ROM, laser discs, video compact discs), the right of the electronic transmission (streaming and permanent downloading) of the Master Recordings via any cable, radio, stationary and mobile satellite networks to any and all receiving devices now known or hereafter devised including, but not limited to, all computers, televisions, hard disk recorders, mobile telephones, and PDAs; the right of the public performance of the Master Recordings, the right to broadcast or rebroadcast the Master Recordings by means of radio or television (including internet, and cable and satellite television) or by direct delivery, music/video on demand, Multichannel Broadcast (f.e. DMX, MCE) and by any other means whatsoever

In the event that any new fields of exploitation occur in the future, Licensor hereby grants to Licensee a so-called "first right of refusal and last matching right" to acquire exclusive exploitation rights of the Master Recordings for the relevant fields of exploitation. Licensee shall also have the right to produce and/or sell during the Term hereof in the Licensed Territory compilation Records containing a portion of the Master Recordings along with the master recordings of other artists. The transfer of rights from Licensor includes Licensee's right to license any of the aforementioned rights to any person, firm or company in any part of the Licensed Territory during the Term hereof.

2. The transfer of rights also includes Licensee's right to sell, or authorize it's licensees (including, and by way of example, and not limitation, iTunes, Mindawn, Rhapsody, BuyMusic, Loudeye, Emusic, Napster, MusicMatch, AT&T Wireless) to sell, via permanent digital download, streams, or burns, as individual tracks or as a whole Album, Digital Masters (as herein defined), pursuant to the terms and conditions of this Agreement, including, but not limited to, the right to:

A) reproduce and convert Master Recordings into Digital Masters;
B) perform and make thirty (30) second clips of Digital Masters available by streaming to promote the sale and distribution of such Digital Masters;
C) promote, sell, distribute, and electronically fulfill and deliver Digital Masters, as individual tracks or entire albums, and associated metadata to purchasers who may use such Digital Masters in accordance with usage rules similar to those set forth by the music services;
D) display and electronically fulfill and deliver artwork for personal use solely in conjunction with the applicable purchased Digital Master;
E) use Digital Masters, artwork, and metadata as may be reasonably necessary or desirable for Licensee to exercise Licensee's rights under the terms of this agreement; and
F) authorize or appoint any licensees or distributors to perform any of the activities in A through E above.

2

§3 EXCLUSIVITY

1. Licensor warrants and represents that at the time of Delivery of each Master Recording to Licensee hereunder as well as during the Term as per §4 hereof, Licensor will be the owner of the entire licensing, manufacturing, selling and distribution rights as well as any other rights granted hereunder in such Master Recordings for the Licensed Territory; that it possesses the full right, power and authority to enter into and to perform this Agreement; and that Licensor will not, as long as the Term of this Agreement (including the options) remains in effect, grant or attempt to grant to any other person, firm or corporation rights of any kind in any Master Recordings licensed hereunder or in any other master recordings of the Artist or allow the Artist to record for any other company or person during the Term and in the Licensed Territory which would derogate from or be inconsistent with the rights granted to Licensee hereunder. Licensor further warrants and represents that the Master Recordings Delivered hereunder will not infringe the rights of third parties; that the Master Recordings are new and original and shall not be made by or include unauthorized Sampling. "Sampling," as used herein, refers to the use and reproduction of pre-existing musical material, hereinafter "Sampled Material," which is owned or controlled by any person other than Licensor or would not otherwise be subject to the rights granted to Licensee herein. Licensor shall be solely responsible for obtaining all consents and licenses necessary or desirable in connection with the use and reproduction, and in connection with the licensing of the use and reproduction, of any Sampled Material in any Master Recording hereunder. Licensor shall be solely responsible for and shall account for and pay to any and all persons who own or control Sampled Material any monies to which such persons are entitled as a result of any use hereunder by Licensee of such Sampled Material. No Master Recording embodying Sampled Material shall be deemed Delivered hereunder unless and until you have obtained, on Licensee's behalf, all rights required hereunder with respect to such Sampled Material.

2. Licensor warrants that the titles recorded under the terms of this Agreement shall not be recorded by the Artist for third parties in the Licensed Territory for the purpose of making phonograph Records or audiovisual devices at any time before a period of seven (7) years from the Initial Release of such Master Recordings by Licensee.

3. Licensor further warrants and undertakes that it has a binding and exclusive agreement with the Artist for its services for the Term including any option periods. Licensor will not waive any of its rights under such exclusive agreement with the Artist and shall take all necessary steps to protect the same.

4. Licensee shall use reasonable efforts to afford Licensor credit in substantially the following form: "Produced under license from Starcastle."

§4 CONTRACTUAL TERM

1. The initial term of this Agreement shall be for a period commencing as of the date written above and shall continue for a period of seven (7) years following the Initial Release of the Master Recordings comprising the first Studio Album listed in § 1 above (hereinafter referred to as the "Term").

2. Licensor hereby grants to Licensee two (2) separate and consecutive options to extend the Term for additional Contract Periods. For the avoidance of doubt, the Term of each relevant option shall be seven (7) years commencing on the Initial Release of each of the

3

relevant Master Recordings. Licensee may exercise such option in writing by registered mail within thirty (30) days after the date of delivery to Licensee of demo-material or within thirty (30) days after delivery to Licensee of the Master Recordings of each new album, whichever delivery is later. Notwithstanding the foregoing, if Licensee has not exercised its option to extend the Term for a further Contract Period within thirty (30) days of the date of delivery of demo material or delivery of the Master Recordings of each new Album, Licensor shall send Licensee written notice that its option has not yet been exercised ("Option Warning"). Licensee shall then have the right to exercise the applicable Contract Period option by sending a notice to Licensor not later than ten (10) business days after its receipt of the Option Warning. If Licensee exercises such option, Licensee shall pay to Licensor a fully recoupable new Advance in accordance with §9(2) hereunder. If Licensee chooses not to exercise an option, the Term shall end seven (7) years following the Initial Release of the relevant Master Recordings.

3. Upon the expiration of the Term, Licensee shall have a further non-exclusive sell-off period of six (6) months. In the event that Licensee (or its licensees) includes Master Recordings in multi-artist-compilations during the Term, such multi-artist-compilations may be exploited after the end of the Term until such multi-artist-compilations are deleted from Licensee's or Licensee's catalog. Notwithstanding the foregoing, in the event that at the expiration of the Term hereof, the Advances paid by Licensee to Licensor in accordance with §9 hereof are not fully recouped and recovered by amounts accounted and credited to Licensor hereunder, the Term shall be automatically extended and shall then terminate on the earlier of the next following 30th day of June or 31st day of December following such recoupment of all Advances paid by Licensee.

4. No composition previously recorded by the Artist shall be recorded under this agreement. No "live" Master Recording, Joint Recording, or Master Recording not made in full compliance with this agreement shall apply in fulfillment of the licensor's commitments hereunder, and Licensee shall not be required to make any payments in connection with any such Master Recording except any royalties which may become due under this agreement if the Master Recording is released or otherwise exploited by Licensee.

Notwithstanding the foregoing, Licensor hereby grants to Licensee the "first and last matching right" to acquire the exclusive exploitation rights in the Licensed Territory of any "Live" Master Recordings recorded by Artist during the Term hereof.

§5 DELIVERY

1. Licensor agrees to supply to Licensee free of charge one or more duplicate CD-R or DAT of the Master Recordings licensed hereunder. Such tapes, acetates and mothers shall be of suitable quality for the use in the commercial production of Records and Licensor agrees to replace, at its own expense, all such devices, which are not suitable for this purpose.

2. Simultaneously with the Delivery of each Master Recording to Licensee, Licensor shall supply to Licensee in writing the correct title of the recorded work, the names of the author(s), composer(s) and publisher(s) thereof, together with any additional copyright information known to Licensor, the names of the recording artists as Licensor displays or intends to display them on the labels of Records marketed by Licensor, and the year and country of first issue of such Recording. Licensor shall be fully liable with respect to the accuracy of such information and shall indemnify and hold Licensee free and harmless from any claims of third parties based on information supplied by Licensor. Licensor's submission

4

of Master Recordings to Licensee shall constitute Licensor's representation that Licensor has obtained all necessary licenses, approvals, consents and permissions.

3. Simultaneously with the Delivery of each Master Recording to Licensee, Licensor shall supply to Licensee free of charge artwork, liner notes and all other material necessary for the manufacture of jackets for Records, such as slides, negatives etc. including all rights of the photographer, designer, etc. to use the same for such purpose free of charge.

4. Licensee agrees to supply Licensor, free of charge, with thirty (30) samples of each one-artist Record manufactured hereunder. Licensor may purchase additional samples of each one-artist Record at a cost of four dollars ($4) per unit.

5. Licensee may provide to Licensor a certain number of one-artist Records produced in accordance with this Agreement that may be sold at or during any live performance given by the Artist. The number of one-artist Records provided by Licensee to Licensor for sale at Artist's live performances shall be mutually agreed upon by the parties. All units of one-artist Records provided by Licensee to Licensor pursuant to this section shall be sold at the standard retail price of fifteen dollars ($15) or at another mutually agreed upon price per unit. Licensor shall be entitled to a percentage of all sales made by Licensor in the sale of one-artist Records provided to it pursuant to this section with the percentage being equal to the royalty rate listed in section 8.A.1 below. Licensor agrees to account in writing to Licensee for all one-artist Records sold pursuant to this section within 7 days after the close of each calendar quarter. Licensee shall then have the option of deducting the total amount owed pursuant to this section from any Royalties owed for the previous calendar quarter. If requested by Licensee, Licensor shall return any unsold one-artist Records provided to it pursuant to this section.

## §6 RELEASE

Licensee may release or have released the Recordings made under this Agreement on any label or trademark. Licensee reserves the right to decide the time and nature of the release, the playing time, kind, form and price of the Recording. Licensee shall be entitled to couple performances of the Artist with performances of other artists in the sole discretion of Licensee. Licensee has the right to delete Recordings made under this Agreement from its catalogue and to re-release such deleted Recordings in its sole discretion.

## §7 PROMOTION

1. During the Term, Licensee and its assigns, shall have the right, without any liability to any person, to use and to authorize other persons to use, the names (including, without limitation, all professional, group and other assumed or fictitious names), approved likenesses and approved biographical material of or relating to Licensor and/or the Artist, and the names (including all professional, group and other assumed or fictitious names), approved likenesses and approved biographical material of or relating to any producer and any other person performing services in connection with the Master Recording, on and in connection with the exploitation of the Master Recording hereunder, without limitation, by means of mechanical or optical devices, on Internet websites, and broadcast via audiovisual media for purposes of advertising, promotion and trade and in connection with the marketing and exploitation of the Master Recording hereunder and general goodwill advertising (advertising designed to create goodwill and prestige and not for the purpose of selling any specific product or service),

without payment of additional compensation to Licensor, the Artist or any other person. Licensor shall supply sufficiently suitable photographic material of Artist at Licensee's request and warrants availability of Artist for photographs to be taken without remuneration.

2. During the Term, the Artist shall not change the name by which the Artist is professionally known. Licensor warrants and represents that in the event that any member(s) of the Artist leaves the Artist, the name of Artist shall become the sole property of the members of the Artist who fulfil the obligations under this Agreement.

3. Licensor warrants and represents that Artist shall reasonably support Licensee's publicity measures and that Artist shall upon request of Licensee participate without remuneration in promotional performances (including television and radio performances and interviews) in connection with the exploitation of the Master Recordings. Licensee shall bear all reasonable travel and accommodation costs for the Artist participating in such promotional performances on Licensee's request.

4. All direct expenses paid or incurred by Licensee in connection with independent promotion or marketing of the Master Recordings of the Artist's performances (i.e., promotion or marketing by Persons other than regular employees of Licensee) shall constitute Advances.

## §8 ROYALTIES

A. Subject to the provisions herein contained and in full consideration of the rights granted hereunder and all services rendered, Licensee agrees to pay to Licensor a royalty at the rates specified hereunder.

1. With respect to Records sold (as defined herein) by Licensee or its export partners in all formats now known or hereafter devised, a basic rate of sixty percent (60%);

2. With respect to Records sold by sublicensees of Licensee, Licensee shall credit Licensor's royalty account with an amount equal to sixty percent (60%) of the relevant net-royalty income received by Licensee;

3. With respect to Records sold through Licensee's mid-price lines, the royalty rate shall be forty percent (40%) of the basic rate referred to in §8 (1) hereof. With respect to Records sold through Licensee's budget-price lines the royalty rate shall be thirty-five percent (35%) of the basic rate referred to in §8 (1) hereof. It is understood that Licensee shall not sell Records through mid-price lines prior to nine (9) months following the date of the initial release of the relevant Album by Licensee in the Licensed Territory. It is understood that Licensee shall not sell Records through budget-price lines prior to one (1) year following the date of the Initial Release of the relevant Album by Licensee in the Licensed Territory;

4. With respect to Records sold via television advertisement, two thirds (2/3) of the basic rate otherwise applicable; and,

5. With respect to Records sold through clubs and mail-order organizations, non traditional outlets, and libraries, fifty percent (50%) of the basic rate otherwise applicable.

B. The royalty rates as set forth above shall be calculated as follows:

6

1.  The royalty rate for sales of Records shall be calculated on the basis of the purchase price from dealers (PPD) actually received by Licensee for the sale of the Master Recording.  The PPD actually received by Licensee shall be exclusive of sales tax.  With respect to the export/delivery of finished products of the Master Recordings to territories outside of the United States but within the Licensed Territory, the royalty rate shall be calculated on the basis of the export purchase price actually received by Licensee from the respective national distributor or wholesaler with whom Licensee collaborates for the sale of Records, exclusive of any taxes thereon such as excise tax, purchase tax, and/or turnover taxes irrespective at which level this tax is due. ("Royalty Base");

2.  With respect to exploitation of the Master Recording by way of user download as referred to in § 2 of the Agreement the royalty rate shall be as follows: sixty percent (60%) of the actual net income received by Licensee for this exploited method, i.e. gross income less taxes and any and all fees becoming due to the download provider or collection societies;

3.  Each Record sold shall mean one hundred percent (100%) of the Records sold, paid for and not returned or exchanged;

## §9 ACCOUNTING/PAYMENT

1.  Licensee shall render accounting statements in United States currency and make payments in United States currency within thirty (30) days following the conclusion of the previous calendar quarter. Royalties obtained by Licensee from licensees shall be accounted for and be paid on the next such possible date after receipt by Licensee, if necessary after deducting any taxes or duties payable thereon.

2.  All royalty statements and all other accountings rendered by Licensee to Licensor shall be binding upon Licensor and not subject to any objection by Licensor for any reason unless specifically objected to in writing, stating the basis thereof, and provided to Licensee within ninety (90) days from the date the relevant royalty statement was rendered.

3.  Payment of royalties and Advances by Licensee to Licensor shall be made payable to the Licensor at the address indicated above. All payments to Licensor shall be deemed effective if they have been directed to Licensor's address as set forth hereabove, as long as Licensee has not been informed otherwise by written notice. Only Licensor is entitled to payments hereunder. Without Licensee's prior written consent, Licensor shall not be authorized to assign its rights hereunder and to nominate any third party to collect payments hereunder.

## §10 VIDEO/AUDIOVISUAL DEVICES

1.  Licensor agrees to render Artist's dramatic performances free of charge for the making of promotional films. In the event that Licensee undertakes to contribute to the costs of making promotional films of the Artist's dramatic/visual performances incorporating the Master Recordings, fifty percent (50%) of Licensee's cost contribution (including travelling costs and other related expenses) shall be deemed an Advance to the Licensor and shall be recoupable from any and all royalties payable to Licensor hereunder. In the event that any licensee of Licensee undertakes to contribute for a promotional film hereunder and recoups such costs contribution from royalties payable to Licensee, fifty percent (50%) of the amount which is recoupable of royalties payable by licensee to Licensee shall be deemed an Advance

7

to Licensor and shall be recoupable from all royalties payable by Licensee to Licensor hereunder.

2.      Licensor hereby exclusively and irrevocably assigns to Licensee the right to exploit during the Term hereof and within the Licensed Territory the promotional film embodying Artist's performances made hereunder in each manner for promotional purposes and for commercial purposes according to §1 and §2 hereof. If the promotional films are used for promotion purposes Licensor shall receive no compensation.

3.      With respect to the commercial exploitation of the promotional films, Licensee shall pay to Licensor a royalty for each audiovisual device sold and not returned in accordance with the terms and conditions of this Agreement and calculated, accounted, paid and subject to the same recoupment, reductions, deductions and diminutions (other than packaging deductions) as are contained in this Agreement for Records. A royalty of ten percent (10%) shall be calculated on the Published Price to Dealers actually received by Licensee for each audiovisual device sold hereunder less a twenty five percent (25%) packaging deduction from the PPD. Net income received by Licensee from commercial exploitation shall first be used to recoup Licensee's 100% contribution to the production costs of such promotional films. In the event that Licensor and/or Artist are the writers of a song which is recorded hereunder and which shall be synchronised with a commercial or promotional film of the Artist's performance, Licensor warrants that Licensor and/or Artist shall grant their writer's synchronisation right to Licensee free of charge.

§11 TOUR SUPPORT-

1.      In the event that Licensee agrees in its sole discretion that Licensee should contribute to the costs of Artist's personal performance tour(s) in support of the first Studio Album or optional Studio Albums(s), if any, Licensor shall, within a reasonable time before the plans for the tour are completed, supply Licensee with a copy of the complete itinerary, specifying the details of each engagement (including the date and place of each appearance). Such itinerary shall be subject to Licensee's approval.

2.      Provided that the tour is completed in accordance with the itinerary approved by Licensee, Licensee shall pay to Artist a sum to be determined in Licensee's sole discretion which sum shall constitute an Advance recoupable from any and all monies payable or becoming payable to Licensor under the Agreement. Notwithstanding the foregoing, tour support Advances shall be fifty percent (50%) recoupable from any and all monies payable or becoming payable to Licensor under the Agreement.

3.      In the event that any licensee of Licensee undertakes to contribute for Artist's personal performance tour(s) in support of the first Studio Album or optional Studio Albums(s), if any, and such licensee recoups such cost contribution from royalties payable to Licensee, fifty percent (50%) of the amount which is recoupable from royalties payable by licensee to Licensee shall be deemed an Advance to Licensor and shall be recoupable from any and all monies payable or becoming payable to Licensor under the Agreement.

§12 REMIXES

1. In the event that Licensee contributes to the costs of remixes of the Master Recordings produced by third parties, fifty percent (50%) of these costs shall be recoupable against royalties payable to Licensor hereunder.

8

2.  In the event that Licensee contributes to the costs of remixes of the Master Recordings produced by Licensor and/or the Artist hereunder one hundred percent (100%) of these costs shall be deemed as additional Advance and shall be therefore fully recoupable against royalties payable to Licensor hereunder.

§13 ARTWORK

Licensor shall provide Licensee with a copy of the artwork/logo on CD ROM. In the event that the artwork provided by Licensor for one Record hereunder is not of manufacturing quality according to Licensee's sole discretion, Licensee has the right to provide the artwork for the relevant Record, only if Licensor is unable to revise such unsuitable Artwork within seven (7) business days of Licensor's receipt of notice.  Any artwork provided by Licensee shall be subject to Licensor's final right of approval. In such case where Licensee provides artwork, Licensee has the right to deduct cost from the advance payable to Licensor in respect of the relevant Record. Licensor has the right to use such artwork provided by Licensee in countries outside of the Licensed Territory.

§14 INDEMNIFICATION

Licensor shall at all times indemnify and hold harmless Licensee and any licensee of Licensee from and against any and all claims, losses, damages, liabilities, costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees, arising out of or in connection with any claim, action, or proceeding made or brought against Licensee on account of any breach of the warranties or representations made by Licensor herein and/or which is the result of a breach by the Licensor of this Agreement.

§15 DEFINITIONS - For purposes of this Agreement, the following definitions will apply:

"Advance" - Any expenditure by Licensee recoupable from royalties or other monies payable under this or any other agreement between the parties, including but not limited to artist Advances, LP Advances, and tour support.

"Musical Composition"/"Composition" – a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.  Recordings of more than one (1) arrangement or version of the same Composition, reproduced on the same Record, shall be considered, collectively, a recording of one (1) Composition for all purposes under this agreement.

"Contract Period"/"Contract Period Options" – the first period, or any option period, of the Term (as such periods may be suspended or extended as provided herein).

"Controlled Composition" – a Composition wholly or partly written, owned or controlled by Licensor, the Artist, a Producer, or any Person in which the Licensor, the Artist, or a Producer has a direct or indirect interest.

"Deliver" or "Delivery" or "Delivered" – when used with respect to Master Recordings means the actual receipt by the representative of Licensee designated in each instance of fully mixed, edited, and equalized Recordings (including but not limited to a final two-track equalized tape copy), technically satisfactory to Licensee for the manufacture and sale of

9

Records, together with all necessary materials required to be furnished by you to Licensee for use in the packaging and marketing of the Records.

"Digital Master(s)" – All forms of sound recordings, whether or not coupled with visual images, now known, or which may hereafter become known, and the underlying Composition which has been reproduced and converted into a Master Recording capable of being distributed in digital format.

"Initial Release" – the last day of the month during which Licensee makes generally available for sale, in accordance with Licensee's normal distribution practices for new Record releases, any configuration of a particular Album or other Record.

"Master Recording," "Record," "Phonograph Record," "Recording" - All forms of sound recording, whether or not coupled with visual images, now known or which may hereafter become known, intended for manufacture or sold primarily for home entertainment or similar use, including, magnetic recording tape, compact disc, film, digital tape, videos, video tapes, DVDs, and any other medium or device.

"Mechanical Royalties" – royalties payable to any person for the right to reproduce and distribute copyrighted Compositions on Records other than audiovisual Records.

"Single" - A Record containing not more than two (2) Masters, one of which may be a re-mix or different mix of the other.

" EP" - A Record containing not less than three (3) nor more than six (6) Masters.

"LP," "Album" or "Studio Album" - A Record containing a minimum of ten (10) Master Recordings, and comprising a total of at least forty five (45) minutes of playing time. Double Albums shall constitute one Studio Album.

§16 NOTICES - All Notices shall be sent to the other party hereto as follows:

1. All notices to Licensor or Artist may be served upon Licensor or Artist personally, by depositing the same, certified, return receipt requested, postage prepaid in any mail box addressed to Licensor at Licensor's address written above.

2. All notices to Licensee may be served upon Licensee personally, by depositing the same, certified, return receipt requested, postage prepaid in any mail box addressed to Licensee at Licensee's address written above.


§17 LAW / JURISDICTION / COLLATERAL COVENANTS

1. This Agreement shall be construed and governed in accordance with the laws of California. Any action brought to resolve a dispute arising from the interpretation or construction of or to enforce this Agreement shall be brought in a court of appropriate jurisdiction in California and both parties hereby consent to the personal jurisdiction of any such court.

2. In the event Licensee, Licensor or Artist is unable to fully exercise their rights hereunder or perform their obligations under the terms of this Agreement due to

10

circumstances beyond its control, including, but not limited to, by reason of "acts of God", fires, strikes, labor disputes, accidents, embargoes, riots, floods, earthquakes, wars, governmental actions, Licensee shall be entitled to suspend this Agreement as well as the performance of the Services to be provided by Artist hereunder for a period equal to the period during which Company or Artist is unable to commence or complete performance of their obligations for any of the reasons set forth herein.

3. Because the performance of the Services is personal and unique, and a breach of this Agreement would cause irreparable injury where there is not adequate remedy at law, Licensee shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief without prejudice to any other relief to which it may have for breach of this Agreement.

4. If any legal action or arbitration is brought to enforce or interpret this Agreement, the prevailing party therein shall be entitled to recover its incurred and accrued expenses, including without limitation, its reasonable attorneys fees and costs from the other party.

5. This Agreement shall not be effective until executed by Licensee, Licensor and Artist.

6. This Agreement may only be amended or modified in writing executed by the parties. The above notwithstanding, this Agreement shall be deemed automatically amended or modified to include all provisions required by any applicable law, rule, regulation or regulatory agency.

7. The headings and titles to the Paragraphs of this Agreement are inserted for convenience only and shall not be deemed a part hereof or affect the construction or interpretation of any provision hereof.

8. No term or provision of this Agreement shall be considered waived by Licensee, and no breach excused by Licensee, unless such waiver or consent is in writing signed on behalf of Licensee. No consent by Licenseee to, or waiver of, a breach by Licensor, whether express or implied, will constitute a consent to, waiver of, or excuse of any other, different or subsequent breach by Licensor. The parties also agree to substitute in good faith all invalid or unenforceable parts with valid provisions of the same contents.

9. Licensor shall not have the right to assign this Agreement or any of Licensor's rights hereunder without Licensee's prior written consent. Any purported assignment by Licensor in violation of this paragraph shall be void.

10. This Agreement constitutes the entire agreement between Licensee and Licensor in connection with this subject matter and supersedes any and all prior or contemporaneous agreements and understandings (whether written or oral) between the parties.

11. In order to make specific and definite and/or to eliminate, if possible, any controversy which may arise between Licensor and Licensee hereunder, each party agrees that if at any time that party believes that the terms of this Agreement are not being performed by the other(s) as herein provided, the applicable party will so advise the non-performing party in writing by Registered or Certified Mail, Return Receipt Requested, of the specific nature of any claim, non-performance or misfeasance and shall allow the non-performing party a period of thirty (30) days after receipt thereof within which to cure such claimed breach.

11

12. Licensee may assign Licensee's rights under this Agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any person owning or acquiring a substantial portion of the stock or assets of Licensee, or to any partnership or other venture in which Licensee participates, and such rights may be similarly assigned by any assignee. No such assignment shall relieve Licensee of any of Licensee's obligations hereunder. Licensee may also assign Licensee's rights to any of Licensee's licensees if advisable in Licensee's sole discretion to implement the license granted.

13. Each party to this Agreement has reviewed and revised this Agreement. Each party to this Agreement has had the opportunity to have such party's legal counsel review and revise this Agreement. The rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this agreement or any amendments or exhibits to this Agreement.

14. This Agreement and the contents hereof constitute a confidential business relationship between the parties. Artist acknowledges that significant irreparable damage could be done to Company should the terms of this Agreement become public knowledge. Artist agrees that Artist will not reveal the terms of this Agreement to any third party (excluding employees, agents, attorneys, accountants and others to whom Artist has a legal obligation to disclose), and Artist shall exercise reasonable precautions to ensure that neither Artist nor any of the foregoing persons shall allow the terms of this Agreement to become public knowledge. If Artist is directed by legal process to disclose such information to any third party, Artist shall notify Company at least fifteen (15) days prior to disclosing the information.

**BY SIGNING HEREUNDER, THE PARTIES AGREE TO ALL OF THE AGREEMENT TERMS AS SET FORTH ABOVE.**

Licensor:                                         Licensee:


By:_____                      By: _____

Name:                                             Name:

Title:                                            Title:

Date:                                             Date:


EXHIBIT "A"

Master Recordings performed by    :

Album Title                       :

Master Recordings                 :

12

## ARTIST'S ASSENT AND GUARANTY

To induce Kompany.com d.b.a. Progrock Records ("Licensee") to enter into the foregoing agreement with [Licensor] ("Furnishing Party") (the "Agreement"):

1.  Each member of the Artist:

(a) represents to Licensee that he has read the Agreement and has consulted with or has had the opportunity to consult with a lawyer chosen by him/her for the purpose of having the legal effect of each of the provisions contained in the Agreement explained;

(b) assents to the execution of the Agreement and agrees to be bound by all grants, restrictions, and other provisions of the Agreement relating to the Artist;

(c) acknowledges that Licensee shall have no obligation to make any payments to the Artist in connection with the services rendered by the Artist or the fulfillment of the Artist's other obligations under the Agreement, except for the payments specified herein; and

(d) agrees that if during the Term of the Agreement the "Furnishing Party" shall cease to be entitled to Artist's recording services, each member of Artist shall, at Licensee's request, take all such steps and actions as shall be needed in order to give to Licensee the same rights, privileges and benefits as Licensee would have had under the Agreement and such rights, privileges and benefits shall be enforceable on Licensee's behalf against Artist and all the terms and conditions contained in the Agreement shall be effective.

2.  (a) Each member of the Artist:

(1) guarantees, absolutely and unconditionally, the full performance by (the "Furnishing Party") of all of the Furnishing Party's obligations under the Agreement;

(2) agrees to indemnify and hold Licensee harmless from any loss, damage, liability or expense (including but not limited to attorneys' fees and legal expenses) which arise from any failure by the Furnishing Party to fulfill the Furnishing Party's obligations under the Agreement, or which are incurred by Licensee in the enforcement of Licensee's rights under this guaranty; and

(3) shall notify Licensee promptly in writing if the Furnishing Party shall cease to be entitled to Artist's recording services.

(b) The Artist's liability under this guaranty is direct and immediate, and is not conditioned upon the pursuit by Licensee of any remedy Licensee may have against the Furnishing Party. This guaranty shall not be revocable at any time or for any reason, including, without limitation, any modification of the Agreement with or without notice to the

13

Artist. No failure by Licensee to exercise any of Licensee 's rights shall operate as a waiver of those rights or any other rights or remedies.

By:_____

SSN#

By:_____

SSN#

By:_____

SSN#

By:_____

SSN#

By:_____
          Name:
          Title:
          Date:

14